We'll hear argument this morning in Case 13-317, Halliburton Company v. the Erica P. John Fund. Mr. Street? Mr. Chief Justice, and may it please the Court, Basic v. Levinson should be overruled because it was wrong when it was decided, and it is even more clearly erroneous today. Basic substituted economic theory for the bedrock common law requirement of actual reliance that Congress embraced in the most analogous express cause of action. Basic's judicially created presumption preserves an unjustified exemption from Rule 23 that benefits only securities plaintiffs. Basic has proven unworkable, has been undermined by later developments, and has proven to have harmful consequences for investors and companies alike. The most direct course is to overrule Basic altogether and require a showing of actual reliance. I believe that in Basic, Justice Blackmun said that there is this economic theory, but also the motivation for the Exchange Act and probability and common sense would lead to this presumption, this rebuttable presumption. So he wasn't relying strictly on an economic theory. I think two or three times in the opinion he tries to make that claim. Yes, Justice Ginsburg, but the Court in Basic recognized that section 18a was the proper analog, but then it immediately turned to its own notions of public policy and the best way to further congressional policy instead of asking what sort of reliance does section 18a require. Where is that? It says that 18a is the proper. I believe it's on page 245 where the Court says, we acknowledge the argument that section 18a is the proper analog, and we accept that there is a reliance requirement under 10b, but the Court then jumps to creating a presumption of reliance rather than asking what sort of reliance section 18a requires, which has always been understood to be actual eyeball reliance. Kagan, Mr. Street, that argument, of course, is just an argument that Basic was wrong in not focusing on section 18, and that's contestable. One could say, actually, they were right not to focus on section 18. Section 9 is the closer analog. But let's put that aside. Are you just saying Basic is wrong, or are you saying that something has changed since Basic? Because usually that's what we look for when we decide whether to reverse a case, something that makes the question fundamentally different now than when we decided it, and that's especially so in a case like this one, where Congress has had every opportunity and has declined every opportunity to change Basic itself. So what has changed in your view? We are saying both that it was wrong when decided and that certain things have changed, at least three things, Your Honor. First of all, this Court has fundamentally changed its approach to interpreting the section 10b cause of action. It's consistently construed it narrowly, and Basic stands out like a sore thumb among that jurisprudence. Second, this Court has consistently held in Comcast and Walmart that there cannot be presumptions of class-wide issues. Instead, class-wide issues must be proved in fact. The Court addressed plaintiffs' experts in those cases who purported to establish class-wide methodologies, and the Court tested those with rigor to determine whether they proved in fact that there were class-wide issues. And we're asking this Court to give the basic presumption, the same rigor that this Court gave the expert reports in Comcast and Walmart, at the very least because those expert reports only generated one class action, and this is underlying Walmart. What is your third? Pardon? You said three. What is your third? Yes. My second premise and my third is that the economics have changed. The economic premise is a basic. In particular, the premise that investors rely in common on the integrity of the market price. The government and the fund do not even contend, they don't even contest that that's the case anymore. Many investors, such as hedge fund, rapid-fire volatility traders, index fund investors, sophisticated value investors, do not — they have investment strategies that do not rely on the integrity of the market price whatsoever. So that sort of reliance is the quintessential individualized issue. So you're not relying anymore on the notion that the efficient markets hypothesis has been undermined. That is not one of the three points that you're making, because essentially I think you — you admit this in your reply brief. You just say Halliburton has never said that market prices — has never contested that market prices generally respond to new material information. So you're agreeing with that, that market prices generally do respond to new material information. Cited at that general level, we don't disagree with it. The problem is that we now know that a binary yes or no approach to market efficiency like the sentence you read tells us very little about whether a particular misrepresentation distorted the market price. So basic has become inconsistent with its own premise.   Kagan. Well, but we don't have that kind of binary approach. What we allow plaintiffs to do is to try to establish a presumption, which they do by showing that a particular market is efficient. And then we allow defendants to rebut that presumption so there's no binary on-off switch. It's actually — it's a presumption, but it's quite dependent on the facts in a particular case as to whether there's an exception to this general rule that market prices, in fact, do generally respond to new material information. It's binary in the sense that the principal driver of class certification is whether the market is efficient in a yes or no binary sense. And that's why we have raised our second position, which is if the Court were inclined to keep the presumption in some sense, it should at least place the burden on the plaintiff to establish that the misrepresentation actually distorted the market price or to give defendants the full right of rebuttal at the class certification stage to establish the price was not impacted. Do we know how often defendants have been successful in rebutting the presumption? It is — it is virtually impossible. It's very unusual outside of the context of the Second Circuit, which allows rebuttal with respect to price impact. Outside of that circuit, I think as one of the amicus briefs said, they're as rare as hen's teeth. And that is another development. Certainly, this Court in Basic thought the fact that the presumption was rebuttable was an essential part of that holding. And it now turns out the courts, especially the court below in this case, have treated it as essentially irrebuttable, even with respect to the fundamental premise of Basic, which is price impact. Sotomayor, isn't the — it's not a question of is it rebuttable. I thought that that's very plain from Basic. It's a question of when. You're arguing that it should be rebuttable at the class certification stage. The other side is arguing, yes, of course it's rebuttable, but that comes in. It merits determination. It doesn't go to the question whether there are individual issues that predominate over class issues. We are not aware of a single instance in which this Court allowed a presumption to be invoked for the very purpose of one stage of litigation, but held that the defendant's right to rebut must be delayed to a later stage. And there can be no doubt that Basic created the presumption of reliance, among other reasons, for the very purpose of allowing class certification of securities fraud cases. I understand your friend on the other side to acknowledge that the efficient market theory is not perfect, that there are situations in which events are not reflected in the market price. I understand you to acknowledge that it's accurate to some extent, but that the exceptions or the extent to which it's not accurate override the extent to which it is. In other words, you're each sort of dealing with, at the — if not at the margins, you know, most of the time it's efficient. You say too much of the time it's not. How am I supposed to review the economic literature and decide which of you is correct on that? We don't think the Court needs to do that. We think the Court should get out of the business of reviewing economic literature and requiring district judges to make this binary yes or no market effect. No, your submission is that we should jettison the Basic test because economists now believe that the efficient market theory is not sufficient — sufficiently accurate or true to support it. So I thought — I mean, you review a lot of the economic literature in your briefs. I assume you wanted me to look at it. Of course, our principal submission is that no economic theory should supplant what Congress enacted in Section 18A in the most analogous cause of action. The economic theory shows that one of the basic premises is no longer even defended. The second premise, that investors rely in common on the integrity of the market price, is not even defended by the government and the Fund. And with that premise knocked out, there's no remaining shred of transaction causation because you have no common reliance even on the price as a transmitter of the information. And in that instance, then fraud becomes the quintessential individualized question. And I'd like to get to the point. Sotomayor, could you explain how do you prove loss causation without proving price impact? I know that there's some individual cases with individual misrepresentations that have a different form of loss causation. But I'm talking exclusively in a class. How do you prove loss, proximate cause or loss causation without proving price impact? A class under a fraud in the market theory could not do that. But the question under Amgen is whether there would be individuals within the class who could show that they actually heard and relied upon the statement and could  Sotomayor, that makes no sense. Because if they relied on their statement, then that's they have to prove loss causation in the same way that the class does. It's only if they're relying on a separate statement, which isn't part of the class, that would entitle them to a different calculation of loss causation. A plaintiff within the class could still establish loss causation without price impact in the same way that a plaintiff in the class could establish loss by purchasing by purchasing in reliance on that misstatement at a price that was not on the New York Stock Exchange. And how is such a plaintiff's claim typical of the class? I mean, you have you admitted that the 23A factors are met, commonality and typicality. Well, if one is a member of this class that says we didn't rely individually, but we did rely on the marketplace as being, as having integrity, if you have someone to whom a direct representation was made, that person is not a proper member of this class, that's a discrete question, not one common to the class, not one typical, the typical investor in a basic class, it's somebody who no representation was made to that person directly. I'm relying on a case where the misrepresentation was made in a way that's typical to the class, but individual class members purchased off of the exchange, and therefore they purchased at a different price, perhaps, than what was on the exchange. But I think the real point is that this Court emphasized and held in Amgen that plaintiffs could, that plaintiffs did need to establish that the market was efficient and that the statement was public. And if the Breyer, can you, I mean, can, to take a totally different case, just thinking of the announcement of the opinion I had, is a contract case, or say it's the treaty that we're talking about, and a group of plaintiffs say, we, Your Honor, would like to show that the way that Argentina treated us was unfair under the treaty. All right? And the other side says, well, we think it's fair. We don't think the treaty covers this. Now, what we have here is a common issue. So we don't have to decide the judge who's right. We've just noticed it was a common issue. And so they make their case, at least prima facie, that they have a side, and the other side will rebut it on the merits. Well, similarly here, they're saying, we don't have to show that the markets incorporate every piece of information. We think they incorporate this information, and it's a general rule they do incorporate most information. The other side wants to show they didn't incorporate this. That's fine. It's a common issue. We'll decide it at the trial. All we're trying to say is, is it a common issue? And it's not a red herring to throw in whether the markets incorporate information, because normally they do, period. Now, what's wrong with what I said? Because market efficiency and publicity are also common issues that this Court required to be considered at the class certification stage, and this Court required those issues to be considered because they are predicates for price impact. Sotomayor, it's certainly not the rule that every issue that is common has to be decided at the preliminaries, or I'm sorry, must be left to the merits. I mean, as you point out, the very issue of whether the market is efficient is something that could be decided for everybody at the merits stage, right? That's absolutely correct. And the reason this Court allowed market efficiency and publicity to be considered is because without those predicates, there's no reason to presume that there's price impact. Well, it makes Mr. Street, there's a real difference with respect to those issues, and I think that this was really what Amgen said. It said that when you rule on those things, it essentially splits up the class so that different members of the class are left in very different positions, but that when you rule on a question like materiality, which leaves all members of the class in the exact same position, either with a viable claim or with no claim, and it doesn't split the class in the way that the efficient markets theory do, that's the difference. And here, and this goes back to Justice Sotomayor's question, I just don't see how this splits the class at all, because if you can't prove price impact, you can't prove loss causation, and everybody's claims die. Well, that same argument could have been made against market efficiency or publicity. If you don't have a public statement reaching the market, there's no way the price could have been impacted. I think that the difference is that even if you don't have market efficiency and so you lose the ability to bring the claim with the fraud on the market presumption, you might still have an individual reliance claim. Yes, and if the market price was not distorted, you could still have an individual reliance claim for exactly the same reasons. If the market's not efficient or the statement is not public, you are by necessity not going to have price impact. So market efficiency and publicity are precisely exactly situated with respect to price impact. And the result of disallowing price impact evidence at the class certification stage, which this Court said was BASIC's fundamental premise, would mean automatic class certification for all New York Stock Exchange companies, because those companies trade in an efficient market in the binary yes or no sense that BASIC states. And that cannot be what this Court says. And that cannot be what this Court intended in BASIC when it created a rebuttable presumption. Kennedy, would you address briefly the position taken by the law professors — I call it a midway position that says there should be an event study — that might not take care of your first two arguments, the narrow construction of 10b-5 and the question of presumptions. But it does seem to me to be a substantial answer to your economic analysis, to the challenge you make to the economic premises of the BASIC decision. Yes. Our principal argument is that the economic theories should not serve as a stand-in for actual reliance. But if a court were to accept the continuing validity of the presumption in some way, the law professor's position, which is also our second question presented, at least makes BASIC consistent with its own premises. Because BASIC's premise is if a plaintiff buys at a price that is distorted by the misrepresentation, he has relied upon the misrepresentation. If we accept that as BASIC's premise, then it only makes sense to focus, like a laser, on the only relevant question, whether the misrepresentation distorted the market price. Kennedy, am I correct, and this would be more of a question for your friend representing the Respondent, am I correct that even under the BASIC framework, at the merits stage, there has to be something that looks very much like an event study? Am I correct about that? Yes. That's absolutely correct, Your Honor. And so then the question would be, since you're going to have to have it anyway, why not have it at the class certification stage? Yes. And the Second Circuit has correctly held that that must be proven at the class certification stage, because price impact is the glue that holds common reliance together, and the district courts within that circuit have been very successfully assessed. Sotomayor, I don't see how this is a midpoint. If you're going to require proof of price impact, why not do away with market efficiency? The whole premise of the other economic theory that you rely on is that a market efficiency is irrelevant. Some information impacts the market, whether efficient or not, and some doesn't, whether efficient or not. I think that's the basic economic argument the other side's making, correct? Yes, Your Honor. So why bother with BASIC at all if we're going to do what you're suggesting? We agree that the We turn the class certification into a full-blown merits hearing on whether loss causation has been proven. It is not loss causation. It's just whether the price was distorted at the time of the misstatement and at the time the purchases were made. Loss causation deals with the later price declines after a corrective disclosure. And we agree that it is a midpoint, because the question should be whether the market price was distorted. We don't think looking at whether the market is efficient as a whole, how many shares are trading, how many analysts are following the stock is very relevant or instructive. And, in fact, this would remedy some of BASIC's under-inclusiveness and over-inclusiveness. Kennedy, tell me, based on your experience, compare the cost, the extent of time, the difficulty of showing under BASIC the efficient, that there is an efficient market, and compare and contrast that with undertaking an event study. Is the latter much more costly, much more time-consuming? No, Your Honor. They're about the same. And, in fact, plaintiffs are commonly using event studies right now as part of their market efficiency showing, because one of the factors courts are requiring for market efficiency is showing a reaction between price and unexpected corporate information throughout the class period. So, in fact, they're running these event studies for the entire class period, where all our position would do is require them to look at the alleged misrepresentations in the case, that is to say, what really matters, and look at whether they distorted the market price as a consequence of that. Well, how hard is it to show that the New York Stock Exchange is an efficient market? Well, the courts look at several factors. Now, admittedly, virtually all of the time, those lead to a finding of yes. But the point is that the event study they're talking about would be a lot more difficult and laborious to demonstrate than market efficiency in a typical case. Well, just to take this case for an example, the plaintiff's expert used an event study of all of the unexpected corporate news throughout the entire class period to prove market efficiency, because courts have said that's one important factor to show market efficiency. We would just focus the event study like a laser on the only thing that matters to show whether or not the misrepresentation distorted the market price. What happens if the plaintiffs say, Your Honor, I have 5,000 people here, all of whom bought the stock on the New York Stock Exchange between March 15 and April 15. And as far as people who had other kinds of reliance, we'll bring a separate case about them later. But everybody in this case bought on the New York Stock Exchange, and our theory of this case is that the stock exchange did absorb the information and the price went up and then went down. Now, what reason is there for purposes of certification to go beyond the efficient market? Is it good enough? I mean, why not? They all bought on the exchange. It's not an irrelevancy. Everybody would have to say it's certainly relevant to the case, and they all have the issue in common. If I go into the event study, why? Because even in a generically efficient market in a binary sense, misrepresentations may not distort the market price. As both lower courts say. Of course, that's true. Indeed, that's the defense. The defense is, well, Your Honor, here it didn't. And the plaintiffs say, you're right. We think it did, but if he's right and it didn't, he wins. But you have to concede, if they're right, you win. So why is that? I don't understand why that's an appropriate issue. I can understand — I don't understand still, maybe it's the same. Why is that an appropriate issue at the certification stage? For precisely the same reasons, the common issues of market efficiency and publicity are essential at the class certifications. Scalia, how many of these cases, what percentage of these cases continue once there has been class certification? Do you have any idea? Very few. Once there has been class certification. Once you get the class certified, the case is over, right? Yes. And less than one-third of 1 percent actually go to a vertical. I see that, and I understand that. But that still strikes me as a different legal issue. And your answer is, well, we decide other things at the class certification stage. Now, I might put in parentheses, which don't belong there. So if — why are we deciding any — why, in other words? I still have my question why. Because if market efficiency and publicity were not considered at the class certification stage, then the plaintiff would just have to plead an efficient market and would immediately go to, you know, collect $200 and pass go and get right to class certification. That cannot be what Basic meant when it said the presumption of reliance depends on plaintiffs relying in common on a misrepresentation that distorted the market price. And I would just point out that the government and the Fund have conceded that price impact evidence can be considered at the class certification stage. Can I ask you a question about these event studies to which you referred? How accurately can they distinguish between the effect of the — the effect on price of the facts contained in a disclosure and an irrational reaction by the market, at least temporarily, to the facts contained in the disclosure? Event studies are very effective at making that sort of determination. In fact, in this particular case, the expert testified that she had done that sort of separation of effects before, but she was not asked to do so in this case, and that's at JA 410 to 411. And the law professors and others have explained in great detail how the event studies work. But in any event, that's a proper burden to place on the plaintiffs, because they are the ones that are invoking this powerful presumption to bypass the requirement of common actual reliance. They are the ones who should have to show that it's the misrepresentation that distorted the market price and not some other irrational reaction. But I wanted to mention that at page 26 of the government's brief and page 53 of the Fund's brief, they concede that price impact evidence should come in at class certification, but they want to make it only one factor in determining whether the markets were efficient. Well, why would you spend all of your time looking at market efficiency and looking at price impact as only one factor instead of looking at the thing that actually matters, whether the price was distorted? And if I could reserve the balance of my time, Mr. Chief Justice. Thank you, counsel.  Mr. Chief Justice, may it please the Court. I want to begin by emphasizing, as this Court did in Basic, that the premise of the Basic decision was not economic theory. It was Congress. This Court said the premise was Congress's premise. And I think that when this Court decided the Amgen case, it said that the fraud in the market presumption was a substantive doctrine of Federal securities law. This is something that has been embedded in the law. It has been ratified by Congress in the PSLRA and in SLUSA. It is something that Congress has legislated assuming that this was the law. For example, in SLUSA, what Congress did, as this Court is aware from last month's decision, is that it moved securities class actions out of State courts and into Federal courts. It said you can't bring class actions under State law. What do you make of section 203 of the PSLRA, which says that nothing in this Act or the amendments made by this Act shall be deemed to create or ratify any implied private right of action? You think that was a ratification of Basic? Well, Your Honor, what this Court said in Amgen afterwards is that what the — what Congress did was it did ratify the private cause of action. And whether that was right or wrong, that is what this Court held in Amgen just a year or so ago. Did we refer to section 203? Did not. Connection with that dictum? I do not believe we did, Your Honor. Maybe we didn't know about it, as the parties here seemingly did not know about it. I don't think it was cited in the briefs. But whether or not you conclude that that was ratified or not, Your Honor, I think what you must conclude is that when Congress acted, both with respect to the PSLRA and even more so with respect to SLUSA, it acted on the assumption that they were legislating on the backdrop of the fraud-on-the-market theory. The SLUSA decision, the SLUSA legislation, makes no sense without the fraud-on-the-market  And the fact that you act on the assumption that the courts are going to do what they've been doing is quite different from approving what the courts have been doing. As I understand the history of these things, there was one side that wanted to overrule BASIC and the other side that wanted to endorse BASIC, and they did neither one. They simply enacted a law that assumed that the courts were going to continue BASIC. I don't see that that is necessarily a ratification of it. It's just an acknowledgment of reality. I think, obviously, the Court will decide, but I think that when you look at what Congress has done, and they have legislated based on the assumption of what the law is, and they have made a decision that, as I think the Court recognizes, would never have been made in SLUSA if they did not, if Congress did not believe that the fraud-on-the-market theory existed. Sotomayor, I don't know that I fully understood your point in your brief as to why proving price impact was so difficult. Is it equal to proving market efficiency? Is it less burdensome, more burdensome? Why can't it be done at the class certification stage? And the question I asked your adversary, if we believe price impact is necessary, why keep BASIC if we are going to put it in the class certification? Let me answer it in the context of this particular case. In this particular case, Halliburton repeatedly said to analysts that their insurance and other reserves were adequate to cover any asbestos exposure. Those assertions proved to be not accurate. The day that it was clear that they were not accurate, December 7, 2001, the Court said the stock price dropped 42 percent. There were no confounding factors. Their expert says December 7th was all about asbestos. Now, we have a dispute as to whether the news that was revealed on December 7th was expected or unexpected. They said it was unexpected. They were caught unawares. We said they knew it all the time, and we've got some documents that indicate that. But whether we're right or they're right, that is clearly a merits decision. That's clearly not a class certification. But why couldn't that same showing be made under the law professor's theory of an event study at the certification stage? You could, Your Honor. And with respect to December 7th, I think that would not be so difficult. But there are nine dates, and with respect to five of those nine dates when there was news revealed, they claim confounding factors. So what you have to do is you have to separate out the confounding factors, the allegedly confounding factors, with respect to each one of those dates. And you've got to do a detailed event study. And in addition, for each day, you've got to look at what the confounding factors are, and you have to try to separate them. That's very complicated. It takes a lot of time, it's very expensive, it's a lot of expert testimony. It is why these things, for example, at the summary judgment stage, are very complicated. Now, an event study that demonstrates the efficiency of the market is far simpler. Halliburton conceded the efficiency of this market. This is not a case in which there's any doubt about the efficiency of the market. Halliburton has repeatedly conceded the efficiency of this market. And I think that when you are trying to prove market efficiency, all you have to do is demonstrate that the basic premise that generally markets take into account, well-developed markets take into account publicly available news, and you can do that relatively simply. Trying to separate out all of the factors that you need to separate out in order to determine whether a culpable misrepresentation was the cause of a price change and how much of that price change was due to that culpable information is very complicated. But even if Basic did not rely on economic theory, and there's a dispute on that, I think the opinion is not quite clear on that one way or the other, if later economic theories show that the market doesn't react in the way Basic assumed it automatically did, then certainly Congress would not wish to foreclose the Court from considering that new evidence if it was strong, clear, and convincing, et cetera. First, Your Honor, I would say three things about that. First, I would say that Basic's premise is not an economic theory. It's not a premise of economic theory. It is a premise of Congress. That's what Basic held, and I think — and I think correctly held, that the whole premise of the securities laws is that when you make fraudulent misrepresentations, you make them public, it affects the market price. The second thing is there hasn't been anything that has changed since Basic that makes Basic less applicable. Alitoso, but to Mr. Boies, to say that false representation affects the market price is quite different from saying that it affects the market price almost immediately. And it's hard to see how the Basic theory can be sustained unless it does affect the market price almost immediately in what Basic described as an efficient market. Isn't that true? Why should someone who purchased the stock on the day shortly, no, an hour or two after the disclosure, be entitled to recovery if in that particular market there is some lag time in incorporating the new information? I think — I think Your Honor is right, that if there is a lag time in a particular market, somebody who is purchased immediately after the misrepresentation would not be entitled to recover. However, in this case and in most cases, that isn't an issue, because in most cases what the class action period is, is something that gives all of the misrepresentations full time to permeate into the market. So it is theoretically possible that you could have a market where there is a lag time, although I will say that since Basic was decided, that lag time has gotten shorter and shorter. Whatever the truth is about how efficient markets were, they are massively more efficient today than they were in 1988. In 1988, people were still sitting at home reading Barron's to try to figure out what was happening in the stock market. Today, you have real-time information. You have all sorts of ways of communicating information. People strive to be able to trade in a second faster than other people. But the Petitioners say that this has produced a whole new genre of investors that are quite different from the fellow that's sitting at home reading the Wall Street Journal. But all of those — And your theory doesn't seem to take that into account. It does, Your Honor, because all of those people rely on the integrity of the market. They talk about these high-frequency traders that trade in and out. Well, if they trade in and out during a day, most of them will not be affected by this because they will have gone in and come out with the misrepresentation intact. It's only when somebody buys when the price is inflated or artificially depressed and then sells after the correct disclosure that there's damage. These people are all buying and selling based on the integrity of the market price. In fact, when you talk about these trading programs, those trading programs, even more than the Barron's reader at home, is relying on the integrity of the market price because that's all they have to rely on. If you think about it, if you went to one of these people with these trading programs and said, you're going to trade on this stock, would you trade on this stock if you knew that it was artificially inflated, of course they wouldn't. Everybody who buys assumes that that market price is — is — is fraud-free. And on — Well, you're saying that the event — that the law professor's event study theory is flawed, then. No. No. You can have event studies. And — and one of the things that an event study does is it attempts to determine whether or not a particular price movement was related to a particular piece of information. That will tell you whether that price movement is related to something that is culpable or not culpable. I don't understand what you just said. Are you saying there are not categories of investors who might say to themselves, you know what, there's a possibility that the price of this stock on this particular day might be artificially inflated by some statement that was made in the past that isn't true, but I'm going to buy it anyway because I still think it's either it's undervalued or because there are some other statistics regarding the market that tell me that this price is going to go up. You tell me that there are — there are not in large categories of investors who think that way? I think there are not large categories of investors who think that way, and I think there is absolutely no empirical evidence at all that there are large categories of investors that think that way. Could there be somebody who says, I know this is fraudulent, but I think I can buy — I know it's artificially inflated, but I think I can buy and ride it up and I can get out before the market knows that there's artificial inflation? There might be somebody like that, and that's why BASIC provides for a rebuttable presumption. You can rebut it. Ginsburg. May I ask you about the rebuttable presumption, Mr. Boies? You agree that BASIC is a presumption and that it can be rebutted, but you say that's a question for the merits. What difference does it make at what stage the rebuttal is allowed? What practical difference does it make if the inquiry is made at the certification stage rather than the merits stage? I think it makes two differences, Your Honor. One is it would inevitably put off the class certification stage, because now you would have to have a discovery on issues that are ordinarily considered to be merits issues. The way an action now works is that you will have just very limited class certification discovery, and you won't get to the full merits discovery until you get past class certification. Now, a lot of cases fail class certification. The idea that class certification is not an important step is simply wrong. A lot of cases fail class certification. But once you have passed class certification, now you go into merits discovery. If you were going to decide these issues that are ordinarily today decided at the merits stage, you would have to delay class certification until you had that merits discovery. You don't dispute. I'm sorry. You don't dispute, though, that you usually don't get to the merits stage once the classes have been certified, do you? That is true, Your Honor, but a lot of that is because there are summary judgment motions. Remember, you have three merits stages already. The pleading stage, which under the PSLRA and under this Court's decision endure, is a real obstacle. Second, you have summary judgment. And then third, you have the trial. More than half of all securities class actions, summary judgment is granted in whole or in part. Thirty-seven percent wholly, another 25 percent in part. So the summary judgment. Where is certification in that timeline? It goes both ways. Generally, you have summary judgment after class certification. You could have summary judgment at the class certification stage. I mean, for example, if you wanted to move in a particular case, if you wanted to move price impact or materiality or any issue into an earlier timeframe, there's nothing that prevents a defendant from making a motion for summary judgment on that issue. And in fact, if there's any doubt about that, this Court could easily clarify that. That would allow you to have class certification in a temporal way at the same time that you were dealing with the merits. But the issue on the merits is that if you don't have a discovery, you can't decide these issues, obviously. And second, the cost and expense at the class action certification stage and the time delay would increase enormously, because now you would have to have these detailed event studies not just to prove efficiency of the market, which was conceded here, and if it hadn't been conceded, we could have demonstrated it, you also have to show what the impact was of the particular allegedly culpable misrepresentation and disclosure. And, for example, in the case that we have here, with respect to eight of the nine disclosure dates, we would have a detailed disagreement and detailed expert reports and expert testimony that would go to what was the price impact, what was the damage in this particular case. Scalia. Mr. Boies, you said that a lot of class certification motions are denied. I had thought that your friend said that that is very rare, except in the Second Circuit. Did I hear him wrong or is he wrong? Well, I think he's wrong. My personal experience is mostly with the Second Circuit in cases like the Deutsche Bank case did not relate to rebutting on the basis of price impact. In the Deutsche Bank case, Judge Forrest held that there was not an efficient market. Well, my question along the same lines is, if a misrepresentation is established from that category of cases, are there many that are still not certified? Because that would be inconsistent with your whole theory that the market is almost always efficient. Well, no. We don't argue that the market is always efficient, Your Honor. There is a lot of litigation about whether particular markets are efficient, less so with respect to New York Stock Exchange markets, more with respect to NASDAQ and other markets. But there is a lot of litigation as to whether particular markets are or are not efficient. And indeed, we went to the expense in this particular case of doing an event study because we were concerned that they would challenge the efficiency of the market. They didn't, but because they could and because that was a normal kind of thing for defendants to do, we did that. I thought there were two questions, and I don't know that you've really answered the two. Sotomayor, I thought your colleague was talking about less than 1 percent, whatever the figure was, is of cases that were certified as classes. How many go to trial? You said something different, which is that not every class is certified. Do you have a percentage for the number, for that number? I don't have a percentage of the classes that are not certified, Your Honor. But Your Honor is completely correct that what he was talking about was the number of these cases that actually go to trial. As I say, more than half of them, a summary judgment is granted in whole or in part. A very large number of them are now wiped out at the pleading stage as well. So the idea that there are not significant merits filters that prevent cases from going to trial is simply wrong, both at the pleading stage and at the summary judgment stage. And the question really is, are you going to have a fourth? Do you know any article that talks about that, those numbers? I don't, Your Honor. I apologize. Mr. Boies, you and I both agree that the PSLRA assumes BASIC. We differ on, you know, what that means, but it does assume it. And so those provisions would sort of be useless if BASIC were entirely overruled. What if we adopted the Professor's, what, BASIC writ small, if we adopted their approach, would those provisions of the PSLRA still be effective? I think the provisions of the PSLRA would still be effective, Your Honor. I think with respect to SLUSA, it's a somewhat different issue. I think that, I think if you, if you adopted those, those provisions with respect to what's proposed, the PSLRA still would make sense. But I don't think SLUSA would. Thank you, Counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court, I'd like to begin by addressing two of the respects in which the Petitioner's counsel argued that circumstances have changed since this Court's decision in BASIC. And the first, one of these was that investors have adopted new strategies that, in his view, don't rely on the integrity of the market price. And I think it's certainly true that investors have devised a wide array of strategies in an effort to beat the market, but it's hard to imagine one that would render irrelevant evidence that the market price had been distorted by fraud. For example, a particular investor might think there are particular types of information that the market doesn't react to quickly enough. And if I'm following that information in real time, and I can trade before the market catches on, then I can make money. I can buy low and sell high. Now, that strategy is certainly going to be undermined if there is other information bearing on the market price, the falsity of which that investor is not aware of, that caused the market price to be inflated. Now, I would agree with you, Justice Alito, that in theory there could be an investor who says in a particular circumstance, I think the gain that I can make by taking advantage of the new information to which the market price has not yet reacted, will more than counterbalance the loss I will suffer when the truth about the unrelated information comes to light. That could happen, but even for an investor of that sort, the distortion wouldn't be irrelevant. It would just be a factor that could be counteracted. And the other thing I would say about the efficiency of the market is that even an investor who is attempting to make money by being the first to take advantage of new information, is relying in essence on the ultimate ability and tendency of the market to incorporate the information. That is, an investor who thinks that a stock is currently undervalued based on the information he has, presumably thinks that in time the stock will no longer be undervalued. The market will come to appreciate the significance of the new information. That would be the basis for his anticipating that the stock price will rise. And so even that strategy is dependent in a fundamental way on the propensity of new information to change the market price. The second thing I wanted to respond to was Petitioner's assertion that Basic is out of keeping with this court's more recent decisions regarding the requirements of Rule 23. And I think that in fact, at least with respect to the interaction between the merits and decisions in Walmart and Comcast, tell courts they ought to do. That is, the court in Basic was ruling on an appeal from a class certification decision. And it was confronted with two competing visions of what the reliance requirement of the Section 10b action should comprise. One of them was the defendant's view that to establish reliance, a plaintiff had to show that he or she had made a disclosure and took it into account in making a trading decision. The other vision of reliance was the fraud on the market presumption that the court ultimately adopted. And the court in Basic recognized that it had to decide this merits question at the class certification stage, because the answer to that question would control whether the reliance element was susceptible of common proof. If the — I'm sorry. Roberts. I'm sorry to interrupt your train of thought, but were the feasibility and prevalence of event studies something that was around when Basic was decided? I don't know exactly what mode. I believe that event studies in some form were used to establish both the efficiency of the market and the potential impact of the misstatement on the price. I don't know the extent to which their sophistication matched the sophistication of event studies today. I would tend to assume that they were much less sophisticated than they are now. Could you explain how the requirement that Basic imposed of proving publicity at the certification stage is consistent with the Court's theory in Amgen? I think the theory in Amgen is that in order to decide whether something has to be proved at the class certification stage, you ask, first, is it susceptible of common proof? And second, if the class is certified and the statement or the fact is ultimately disproved down the road, is the effect going to be that the class splinters or that all plaintiffs lose in common? And I think the Court's theory in Amgen, the rationale for saying that publicity had to be proved at the class certification stage, was that if it were proved down the road that the statement was not made publicly, some plaintiffs might still have good claims because they would have heard and relied upon the information even though it wasn't communicated to the public, and therefore, the effect of disproof of publicity would not be to cause all class members to lose, it would be to cause the class to splinter. Do you think that's a realistic, that that is something that's likely to happen in other than extremely rare cases? Well, there are certainly plenty of securities fraud cases over the years that involve private misrepresentations made one on one by a broker, a salesperson, et cetera. I take your point that in terms of practical significance, it is the case that the recoveries and the large class actions dwarf the ones in individual suits. If that's the — that's what's nagging at me that I don't fully understand, but if we had a case where all the plaintiffs had, in fact, and everyone in the class had bought on the New York Stock Exchange at such-and-such a period, then I guess in principle, neither would be appropriate for the classification stage, certification stage. Neither would be appropriate for the certification stage. You wouldn't have to prove efficient markets, all you'd have to do is allege them. Because, after all, if they do exist, then the reliance element is proved subject to rebuttal, and if the rebuttal wins, it's not. And that's not a question that's all in common. It's all in common. That's the conceptual point I haven't quite understood. Well, at least to the efficiency of the market, it wouldn't be the case that disproof of efficiency would defeat the claim of every class member. Why not? Because a particular class member, even without showing an efficient market, could show that he or she personally. If we had a class, they all conceded that they bought it on market at the same time, had no information, then it would go to the later stage. If the class were defined in that manner as people who had no such information, then the class wouldn't splinter. Mr. Stewart, can I just ask a more general question? You're representing the SEC here, the principal regulators of the securities markets and the securities industry. So if, I guess it's a two-part question, if BASIC were overruled, what is the view as to what, how that would affect the securities industry and how it would affect individual decision-making with respect to securities? And same question for if the law professor's position was adopted. Well, let me take the first part first, because I think in part it illustrates an important aspect of this case that tends to get lost. We're arguing about this as though it's procedure, but really what is fundamentally at issue is what is the class of, what is the category of investors who would have a potentially valid Section 10b-5 action? That is, the Petitioner's view is the only people who could be proper plaintiffs in a section, in a private Section 10b suit, whether a class action or an individual action, are people who personally read, reviewed, subjectively took account of the false information. And the view on the other side, the view under BASIC, is that any person who bought stock at the inflated price on the market, a price inflated by fraud, and subsequently lost money as a result when the truth was made known, any such person would have a remedy. And if BASIC were overruled, if people were told if you buy without doing this sort of research into primary sources, you will have no potential recovery at the end of the day, I don't know that the SEC has a defined view about exactly what the consequences would be, but certainly the consequences are potentially dramatic. You have an amicus brief filed by institutional investors, many of whom rely on indexing strategies, and they try to save management fees by not doing all the research into the primary sources, by allowing the market to do most of the work, and then buying stocks that are broadly representative of the market. And they've appealed to the SEC. Scalia. If the SEC brings a fraud action, can it rely on the market theory, fraud on the market theory? Stewart. The SEC would have no need to do so, because reliance wouldn't be an element of the SEC's cause of action. The SEC would have to establish that there was a violation, but it wouldn't have to establish that it or any individual investor relied. And so the institutional investors at least have represented to the Court that their investment strategies will need to change if they have to choose between saving money by relying on indexing strategies and having available potential avenues  I'd like to go back to Part 2 of Justice Kagan's question, which is what is your view of the consequences if we adopt the law professor's brief? I understand the law professor's — there were a few law professor's briefs, and I understand the one you're referring to to be the one that basically advocated a shift away from analyzing the general efficiency of the market and focusing only on the effect or lack of effect on the particular stock. I don't think that the consequences would be nearly so dramatic. In fact, if anything, that would be a net gain to plaintiffs, because plaintiffs already have to prove price impact at the end of the day. Thank you, counsel. Mr. Street, you have five minutes remaining. Thank you. I'd like to start with one statistical matter that was — that was raised by Justice Sotomayor. The most recent studies by NERA and Stanford show that 75 percent of class certification motions are granted in securities cases, and that number is much, much higher with respect to New York Stock Exchange companies that essentially have no way to dispute market efficiency. Now, I want to turn to the argument that — that basically — How many of those drop out at the summary judgment stage? Only 7 percent even make it to the summary judgment stage, Your Honor. So out of those, I think Mr. Boies is correct that maybe half are granted and half are denied, but only 7 percent even make it to that stage, because once the case gets past class certification, as this Court has recognized time and again, there's an interorum effect that requires defendants to settle even meritless claims. BASIC did not look to what Congress intended. Congress did not even have a private cause of action in Section 10b. And the most analogous cause of action for somebody who purchased in the aftermarket context required a showing of actual reliance. So the idea that this was somehow based on interpreting the statute is nonsensical. Whatever might have been at the beginning, given the most recent legislation, Congress took a look at the 10b-5 action, and it made a lot of changes. It made heavy pleading requirements. It's difficult to say that this — Congress would have legislated all these constraints if it thought there was no action to begin with. The PSLRA includes securities actions under both the 1993 and 1934 Act. It's not just limited to 10b-5. So to Justice Scalia's point, there's actually not a single provision of the PSLRA that would be rendered inoperable. Congress did take a look at it, Your Honor. That's absolutely correct. It chose — it thought about embracing BASIC, and it thought about overruling BASIC, and it chose to do neither. When Congress wanted to codify one of the judicially created elements of the 10b-5 cause of action, it did so expressly. Breyer, what is to prevent now a defendant from going in after the efficient market is shown and saying, well, we have our event study, and our event study shows that this particular piece of information had no impact, and therefore, they're not going to be able to prove reliance by just relying upon efficient markets, and therefore, don't certify the class. Why couldn't you do that right now under BASIC? That is what we are asking this Court to hold under our second view. Oh, is there anything — is there any one court that said, no, you can't do that, we forbid you, even though it says in BASIC that you're allowed to rebuff? Yes, Your Honor. That's precisely what the Fifth Circuit held in this case, relying on Amgen to prohibit us from putting on our own price impact evidence. And it acknowledged that there was no price impact in this case. Thank you. But it said we have to turn a blind eye to that fact. And to Justice Breyer's point, I think Justice Breyer is exactly correct that market efficiency, publicity, and price impact are all in precisely the same boat. They're all common issues, and if one of those is missing, you do not have loss causation if the class is limited to the exchange. But I don't think this Court should do away with market efficiency, publicity, and I think it should allow price impact at the class certification stage. Otherwise, the fraud in the market presumption is reduced to a pleading requirement, not something that must be established at the class certification stage as Wal-Mart requires. So your preference would be to make the plaintiff bear the burden, or just for defendants to be able to rebut price impact? It would be most consistent with rule 23 to place that burden on the plaintiff, because it's the plaintiff's duty to show that common issues of reliance predominate. And the way the plaintiff gets there is by showing that the plaintiff relied in common on the misrepresentation at the time it distorted the market price. Congress recognized that the presumption was created by this Court, essentially sitting as a common law court. Congress chose to remain silent, which leaves the issue with this Court where it began to consider under traditional principles of stare decisis in light of intervening developments whether it should be overruled. The — it should be overruled for one additional reason that we haven't gotten to this morning, which is that the basic generated regime of class actions is harming the very investors that it's supposed to help. It is the small investors and shareholders that are paying these judgments out of their own pocket, often to other shareholders, with a huge cut for both sides' lawyers and insurance costs. The basic regime of class actions is a huge net loss for shareholder wealth. And it's frequently the small investors who bought before the class period and held all the way through who are paying the judgment because they hold at the time of the settlement, whereas it's the large institutional frequency traders who bought and sold many times during the class period that are getting the money but are not having to pay any because they don't hold at the end of the class period. Thank you, counsel. The case is submitted.